COMMUNITY HOSPITAL OF INDIAN-
APOLIS, INC., Plaintiff-Appellee,

v.

Richard S. SCHWEIKER, Secretary of
Health and Human Services,
Defendant-Appellant.

No. 82–1606.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 16, 1982.

Decided Sept. 7, 1983.

As Amended Sept. 8, 1983.

Rehearing and Rehearing En Banc
Denied Nov. 21, 1983.

Richard A. Urbin, U.S. Dept. of H.H.S., Chicago, Ill., for defendant-appellant.

James D. Kemper, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., for plaintiff-appellee.

Before BAUER and WOOD, Circuit Judges, and ·CAMPBELL, Senior District Judge.*

* The Honorable William J. Campbell, Senior Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

BAUER, Circuit Judge.

This case involves the appropriate Medicare reimbursement classification for the August F. Hook Physical Rehabilitation Center operated by Plaintiff-appellee, Community Hospital of Indianapolis. Defendant-appellant, the Secretary of Health and Human Services (the Secretary), determined that reimbursement for patient care in the rehabilitation center should be in accordance with the level set for routine rather than special care units. The district court, on cross-motions for summary judgment, reversed the Secretary's decision on the ground that it was not supported by substantial evidence. We agree with the district court that the administrative record in this case did not adequately support the Secretary's decision; accordingly, we affirm the district court judgment.

## I. BACKGROUND

Community Hospital of Indianapolis (the Hospital) is a "provider of services" under the Medicare program. See 42 U.S.C. §§ 1395x(e), 1395x(u). By agreement, the Hospital is reimbursed for services provided to Medicare patients through a fiscal intermediary. Under the Medicare program, two levels of reimbursement are available. The lower level of reimbursement applies when Medicare patients are treated in the Hospital's routine service areas.[1] A higher level of reimbursement is available when Medicare patients are hospitalized in "special care units."

In July 1974, the Hospital opened the August F. Hook Physical Rehabilitation Center. This forty-eight bed inpatient unit provides health care for physically disabled individuals. The special needs of rehabilitation center patients make patient care in this hospital unit more costly than routine care; this cost differential results from the need for special equipment for physical rehabilitation as well as the need for a higher staff to patient ratio.

Initially the rehabilitation center was reimbursed by Medicare at the routine care level. After gaining some experience in the operation of the center, however, the Hospital sought to have the rehabilitation center classified as a special care unit for Medicare purposes. Thus, in January 1976, the Hospital sought the approval of its fiscal intermediary to treat the rehabilitation center as a special care unit on its cost reports.

The fiscal intermediary responded favorably to the Hospital's request. On March 15, 1976, the intermediary authorized the Hospital to treat the rehabilitation unit as a special care unit on the Hospital's Medicare cost reports. This authorization was reiterated in November 1976 and the intermediary accepted the Hospital's treatment of the rehabilitation center as a special care unit on the cost report submitted for the 1976 fiscal year.

The Hospital continued to report the rehabilitation center costs under the special care unit rubric for fiscal years ending September 18, 1977, and September 17, 1978. The instant controversy arose when the intermediary disallowed these classifications. The intermediary's about-face was in response to a letter issued by the Department of Health, Education and Welfare,[2] and a revision to that Department's Health Insurance Manual. The intermediary determined that the rehabilitation center did not qualify for special care unit status as that status was defined under the Medicare program.

The Hospital timely filed appeals from the Notices of Program Reimbursement denying special care unit treatment for the rehabilitation center for 1977 and 1978. These appeals were consolidated before the Provider Reimbursement Review Board

---

1. "Routine service area" is a catch-all categorization of those in-patient hospital units not qualifying for special care unit status.

2. Now the Department of Health and Human Services.

(PRRB). *See* 42 U.S.C. § 1395oo. After a full adjudicative hearing, the PRRB ruled that the rehabilitation center qualified for treatment as a special care unit.[3]

On November 13, 1980, the Deputy Administrator of the Health Care Financing Administration, acting on behalf of the Secretary, reversed the PRRB ruling. The Deputy Administrator's opinion letter incorporated by reference all of the facts as found by the PRRB. Nonetheless, the rehabilitation center was denied special care unit status because the center did not render services comparable to those provided to critically ill patients in recognized special care units.

The Hospital appealed the Secretary's decision to the District Court for the Southern District of Indiana. That court reversed the Secretary's decision, holding that it was not supported by substantial evidence. This appeal followed.

## II. ISSUES

The Secretary offers four issues for our consideration: (1) whether the Secretary's interpretation of the special care unit definition, which requires care comparable to that provided to critically ill patients in recognized special care units, is reasonable; (2) whether the Secretary's determination that the rehabilitation center does not provide a level of care comparable to that provided to critically ill patients in recognized special care units is supported by substantial evidence; (3) whether the Secretary's determination that the rehabilitation center does not provide "extraordinary," "concentrated," and "continuous" care is supported by substantial evidence; and (4) whether the fiscal intermediary's earlier authorization of special care unit status estops the government from treating the rehabilitation center as a routine service area.

3. The PRRB held that the uncontroverted testimony at the hearing clearly indicated that the rehabilitation center provided extraordinary, concentrated, and continuous care as required by 42 C.F.R. § 405.452(d)(10).

4. Both parties agree that the rehabilitation center satisfies the first, fifth, and sixth criteria.

## III. DISCUSSION

Under the Medicare statutory scheme, judicial review of the Secretary's decision is undertaken pursuant to the dictates of the Administrative Procedure Act. In this case, we are called upon to review the record of an administrative agency hearing required by statute. Thus, the appropriate standard of review is whether the findings and conclusions of the agency are supported by substantial evidence. 5 U.S.C. § 706(2)(E); *see Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

In this case, there are two aspects of the Secretary's decision that command our attention. The first is whether the Secretary applied the correct standard in determining what constituted a special care unit for fiscal years ending in September 1977 and 1978. The second is whether substantial record evidence supported the Secretary's determination that the care provided by the rehabilitation center was not "extraordinary," "concentrated," and "continuous."

### A. The Regulatory Definition of a Special Care Unit

During 1977 and 1978, the fiscal years at issue in this case, 42 C.F.R. § 405.452(d)(10) enumerated six criteria necessary to qualify a unit for special care unit treatment. These criteria provided: (1) the unit must be in a hospital; (2) the patient care in the unit must be extraordinary; (3) the care in the unit must be concentrated; (4) the care in the unit must be continuous; (5) the unit must be physically identifiable as separate from general patient care areas of the hospital; and (6) the unit must have specific written policies.[4]

The dispute focuses on whether criteria two, three, and four were satisfied and also on whether satisfaction of these six elements, given their ordinary meanings, is the exclusive test for whether a unit is entitled to special care unit treatment.

■ The Deputy Administrator, in rejecting special care unit treatment for the rehabilitation center, went beyond the plain meaning of these requirements. The Deputy Administrator concluded that the rehabilitation center was not a special care unit because "the type of care [rendered by the center was] not comparable to traditional established special care units where patients are in critical condition and in immediate life-threatening situations." R. 0016.

The Secretary urges that the "critically-ill patient" requirement was implicit in 42 C.F.R. § 405.452(d)(10) for the years in dispute, and that it was therefore proper to deny special care unit status for the rehabilitation center. The Secretary supports this interpretation of the regulation with citation to a June 1977 revision to the Provider Reimbursement Manual and an amendment to the regulation on August 18, 1980.

The Provider Reimbursement Manual is a portion of the Health Insurance Manual published by the Health Care Financing Administration. The manual is distributed to intermediaries and instructs them in the application of reimbursement regulations. Revision No. 177 to the manual defined special care units as those which incorporated "extensive life-saving nursing services." It was this revision that prompted the fiscal intermediary in this case to deny special care unit status to the rehabilitation center.

The Secretary argues that the manual definition of a special care unit is entitled to great deference because the Health Care Financing Administration is likely to know more about the underlying intent of 42 C.F.R. § 405.452(d)(10) than the courts. Under the circumstances of this case, however, such deference is not warranted. As the Supreme Court noted in *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945), "a court must ... look to the administrative construction of the regulation if the meaning of the words used is in doubt." *Id.* at 414, 65 S.Ct. at 1217. The plain meaning of the words used in 42 C.F.R. § 405.452(d)(10) allows of no such doubt here. The regulation itself in no way suggests that special

care unit status is to be limited to patient care areas where extensive life-saving services are available.

Moreover, as this court noted in *St. John's Hickey Memorial Hospital, Inc. v. Califano,* 599 F.2d 803 (7th Cir.1979):

> [T]he degree of deference to be accorded agency action varies with the circumstances, and a careful consideration of the Medicare statute and the manner in which it has been administered reveals that such deference would be particularly inappropriate in this case where we are not setting aside any regulation but only disagreeing with an unofficial interpretation of it.

*Id.* at 812. Thus, we reject the Secretary's argument that we must defer to the Provider Reimbursement Manual Revision as the dispositive indicator of the regulation's intent.

We also reject the Secretary's contention that this dispute, which involves provider reimbursement for the 1977 and 1978 fiscal years, can be resolved by reference to a subsequent amendment to the regulatory definition of a special care unit.

On August 18, 1980, the Secretary amended 42 C.F.R. § 405.451(d)(10). 45 Fed.Reg. 54,757 (1980). The amended regulation had only prospective effect; it took effect for provider cost reporting periods beginning on or after October 1, 1980. As amended, the regulation labels the type of unit that qualifies for separate reimbursement as an "intensive care type inpatient hospital unit," rather than a special care unit. The amended regulation defines the level of care necessary for separate reimbursement treatment as follows:

> To be considered an intensive care type inpatient hospital unit, the unit must furnish services to critically ill patients .... The unit must also meet the following conditions:
>
> (i) The unit must be in a hospital;
>
> (ii) The unit must be physically and identifiably separate from general routine patient care areas, including sub-intensive or intermediate care units ...;

(iii) There must be specific written policies that include criteria for admission to, and discharge from the unit;

(iv) Registered nursing care must be furnished on a continuous 24-hour basis. At least one registered nurse must be present in the unit at all times;

(v) A minimum nurse-patient ratio of one nurse to two patient per patients per day must be maintained . . . ;

(vi) The unit must be equipped, or have available for immediate use, life saving equipment necessary to treat the critically ill patients for which it is designed . . . .

45 Fed.Reg. 54,760 (1980).

The Secretary now urges that this amendment was intended merely to clarify the underlying intent of the provider reimbursement regulations. Whatever the purported intent of this amendment, we believe that the amended regulation added new requirements for providers seeking the higher level of reimbursement. Thus, while the Secretary's new interpretation of what level of care is required to justify the higher level of reimbursement is a reasonable exercise of the Secretary's delegated authority under the Medicare program, we cannot agree that these requirements were implicit in the plain meaning of the regulation in effect for the cost years at issue here.

We agree with the district court that "[t]he Deputy Administrator's opinion that for a care unit to be classified a special care unit the patients must be 'in critical condition and in immediate life-threatening situations,' adds a requirement to the regulation that was not applicable during fiscal years 1977 and 1978." *Community Hospital of Indianapolis v. Schweiker,* No. IP 80–1225–C (S.D.Ind. Feb. 4, 1982). Accordingly, we hold that the Secretary's decision to deny special care unit treatment to the rehabilitation center, to the extent that decision was based on the absence of critically ill patients in the center, cannot be justified under the applicable regulation.

## B. The Meaning of "Extraordinary," "Concentrated," and "Continuous" Care

The Deputy Administrator framed the issue in this case as "(w)hether the care required by patients in [the rehabilitation center met] the Regulation's requirement of being extraordinary, concentrated and continuous . . . ." R. 0010. We must determine whether the Secretary's decision that this requirement was not met is supported by substantial evidence in the administrative record.

Substantial evidence is not necessarily a preponderance of the evidence, but it is more than a mere scintilla. Substantial evidence is evidence that a reasonable mind might accept to support a given conclusion with reference to the administrative record as a whole. *See, e.g., Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

The Secretary urges that "overwhelming evidence supports the Secretary's determination that plaintiff's rehabilitation unit provides care *different from* the extraordinary, concentrated and continuous care provided by recognized special care units." Appellant's br. at 28 (Emphasis added). Thus, the Secretary argues the care provided in the rehabilitation center is not extraordinary, concentrated, and continuous. We do not find this argument persuasive.

The regulation in effect for 1977 and 1978 did not require that all special care units provide care identical to that provided in, for example, coronary or intensive care units. Rather, the regulation required that the level of care provided in a special care unit be comparable to the level of care provided to patients in such recognized units. And, contrary to the Secretary's assertions, the level of care provided in the rehabilitation center was comparable to the level of care provided in the Hospital's coronary and intensive care units—units that were properly accorded special care unit treatment for Medicare reimbursement purposes.

The uncontroverted testimony in this administrative record clearly demonstrates

that nursing staff-patient ratios and operational costs of the rehabilitation center were much closer to those of the recognized special care units than to those of the Hospital's routine service areas. Moreover, the rehabilitation center, like the recognized special care units, did not employ nurse's aides although such employees are regularly engaged to perform tasks in routine service areas. These factors figured heavily in the PRRB's determination that the rehabilitation center was, in fact, a special care unit.

The Secretary adopted the factual findings of the PRRB. In reversing the PRRB's ultimate determination, the Secretary concluded that these facts did not support special care unit status for the rehabilitation center because the "extraordinary, concentrated, and continuous care" requirement implicitly included a requirement that the unit care for critically ill patients. As we already have explained, however, the Secretary's interpretation of 42 C.F.R. § 405.452(d)(10) was not justified under the plain meaning of that regulation.

The uncontroverted facts, as found by the PRRB and adopted by the Secretary, clearly demonstrate a level of care consonant with that provided in recognized special care units. This care, moreover, was extraordinary, concentrated, and continuous within the plain meaning of those words. There is no evidence in the administrative record to support the Secretary's contrary determination.

Furthermore, we agree with the district court that the intermediary's two specific approvals of treatment of the rehabilitation center as a special care unit constitute additional evidence of the Secretary's interpretation of 42 C.F.R. § 405.452(d)(10) before that regulation was amended.[5]

## IV.

For the foregoing reasons, we hold that the Secretary's determination that the reha-

bilitation center was not entitled to special care unit reimbursement treatment for the 1977 and 1978 cost years was not supported by substantial evidence in the administrative record. Accordingly, the judgment of the district court, reversing the Secretary's determination and remanding this cause for further proceedings, is affirmed.

AFFIRMED.

HARLINGTON WOOD, Jr., Circuit Judge, dissenting.

The majority opinion almost persuades me, but not quite, so I respectfully dissent.

The regulation in effect in 1977 and 1978 and at issue provided that in order to be considered a "special care inpatient hospital unit"

> [T]he unit must be in a hospital, must be one in which the care required is extraordinary and on a concentrated and continuous basis and must be physically identifiable as separate from general patient care areas. There shall be specific written policies for each of such designated units which include, but are not limited to burn, coronary care, pulmonary care, trauma, and intensive care units but exclude post-operative recovery rooms, postanesthesia recovery rooms, or maternity labor rooms.

42 C.F.R. § 405.452(d)(10) (1979).

The majority considers the regulation's six criteria, but the examples given in the regulation cannot be ignored either, "burn, coronary care, pulmonary care, trauma, and intensive care units...."

The Hook Physical Rehabilitation Center, no matter what good service it performs, does not qualify under that regulation. The supervisor of the unit describes the unit as designed "to bring the person to the highest level of function" consistent with the patient's disability, illness or injury.

---

**5.** We reject the Secretary's contention that the district court's comments concerning the intermediary's earlier approval of special care unit treatment constitute estoppel against the government. Rather, we read the district court's opinion to suggest what we have noted

here—that the intermediary's earlier determination is suggestive of the Secretary's interpretation of 42 C.F.R. § 405.452(d)(10) as that regulation existed during the fiscal years at issue in this case.

Part of the staff function is to "push" patients out of bed to perform physical tasks. Recreational therapy is available. Some patients are encouraged to swim, bowl, play basketball, bingo, and even take field trips to restaurants. A washer and dryer are provided for patient use. Occasionally patients are furloughed home on weekends, but during that time receive no nursing care from the unit.

Thus it can be seen that unit treatment is not always concentrated nor continuous and does not fall generally within the same class as the examples given in the regulation. In *White Memorial Medical Center v. Schweiker,* 640 F.2d 1126 (9th Cir.1981), the Ninth Circuit Court of Appeals held:

> Section 405.452(d)(10) is an *ejusdem generis* regulation. It authorizes additional payments for "Intensive care units, coronary care units, and other special care in-patient hospital units." In describing such units, the regulation states " . . . such designated units [shall] include, but are not limited to burn, coronary care, pulmonary care, trauma, and intensive care units . . . ." The standard rule of construction of an *ejusdem generis* statute is that the general language refers only to objects similar in nature to those objects enumerated by the specific words. (Citations omitted.)

When the regulation was promulgated, the Secretary followed the standards and principles used and accepted by the hospital industry. The Joint Commission on Accreditation of Hospitals defined a "special care unit" as "[a]n appropriately equipped area of the hospital where there is a concentration of physicians, nurses and others who have special skills and experience to provide optimal medical care for critically ill patients." The hospital industry itself would not have considered the Hook Center as qualifying.

Later in 1980, the Secretary amended the regulation. The majority views the amendment as adding new requirements. However, at that time the Secretary in stating the necessity for the amendment, 45 Fed. Reg. 54,757 (1980), explained that HEW always had maintained and intended that only those units would qualify which furnished a level of care equivalent to intensive care. It was further explained that the various court and administrative decisions interpreting the regulation as originally written reflected a lack of uniformity of understanding as to what constituted a special care unit. Consequently the new amendment was necessary to define more clearly what special care units had always been intended to constitute.

In any event, as I do not believe that field trips to restaurants and home furloughs meet the test, I would not quarrel with the Secretary's interpretation and application of the regulation.