Judy PEARSON, Plaintiff,

v.

Otis BOWEN, M.D., Secretary of
Health and Human Services,
Defendant.

No. 86 C 18.

United States District Court,
N.D. Illinois, E.D.

Nov. 6, 1986.

Supplemental Opinion Dec. 1, 1986.

Joseph A. Antolin, Martha Tonn, Legal Assistance Foundation of Chicago, for plaintiff.

Nancy Needles, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Judy Pearson ("Pearson") seeks judicial review of a final decision by the Secretary of Health and Human Services ("Secretary")[1] denying Pearson's claim for supplemental security income benefits. Pearson

---

**1.** Otis Bowen succeeded Margaret Heckler as Secretary December 12, 1985. Under 42 U.S.C. § 405(g) this action survives that change, with Bowen substituted as defendant pursuant to Fed.R.Civ.P. 25(d)(1).

initially applied for benefits under Social Security Act ("Act") § 1602, 42 U.S.C. § 1381a.[2] After a July 17, 1985 hearing (the "Hearing"), Administrative Law Judge Charles G. Walsh ("ALJ Walsh" or simply the "ALJ") denied Pearson's application September 17, 1985. Pearson then exhausted her administrative remedies in proper sequence and brought this action against Secretary under Section 405(g).

As invariably occurs in these actions, which come to this Court on the administrative record and a decision by Secretary, the parties have filed cross motions for summary judgment. For the reasons stated in this memorandum opinion and order, Secretary's motion is denied and Pearson's motion is granted.

### Facts

Pearson, who was 59 at the time of the Hearing, has a tenth grade education and vocational training as a seamstress (R. 28–29). She worked as a sewing machine operator from 1965 until early 1972 (R. 109), most recently for General Textile Company, where she made coat parts. As a sewing machine operator at General Textile, Pearson had to sit at her machine most of the workday. Her work required constant bending, and she had to operate the machine with a knee press. Pearson also had to collect her fabric and carry her finished products to another work station, so she had to walk a short distance and lift up to ten pounds (R. 30–31, 110–11). General Textile laid Pearson off in 1972 "because the work was slow." Pearson was unable to find work afterwards and has not worked since 1972 (R. 31).

In her most recent application for supplemental security income, Pearson listed "arthritis in her lower back, high blood pressure, diabetes and an enlarged heart" as her impairments (R. 79). She had claimed "post-polio" as her disabling impairment in earlier applications (R. 48, 64).[3] She had polio as a child, leaving her with a slightly twisted, shortened right leg (R. 32–33, 145) that causes her to walk with a limp. Pearson was hospitalized for 12 days in 1980 (R. 130–54)[4] and was seen monthly thereafter by doctors at the Madison Medical Center (R. 179–241). Her treating physicians there prescribed medication for her high blood pressure, diabetes, pain and nervousness (R. 14). In addition she takes Tylenol or Anacin to alleviate her pain (R. 33). Several doctors examined Pearson as consultants for Secretary and submitted reports. Two physicians also submitted evaluations of Pearson's physical capabilities (R. 159, 263).

Although those medical records are inconsistent in some respects, they are in agreement as to several aspects of Pearson's medical problems. Pearson does suffer from diabetes and high blood pressure, but those ailments are well controlled by medication and should cause her few physical problems (R. 261). During Pearson's 1980 hospital stay, she was diagnosed as suffering from "severe osteodegenerative arthritis," a problem assumed to be caused by the residual effects of Pearson's childhood polio. X-rays revealed demineralization of Pearson's vertebrae and knees as well as mild scoliosis of the spine (R. 143). Those findings were confirmed by a 1984 radiology report (R. 166). Pearson's right knee has a limited range of motion (R. 162, 260).

Secretary's three consulting physicians who actually examined Pearson differed markedly in their findings. Dr. Jean-Jacques examined Pearson July 7, 1982. He reported Pearson suffered from a significant range of motion limitation in her

---

**2.** All sections of the Act will hereafter be cited "Section—," referring to the Title 42 numbering rather than the Act's internal numbering. Regulations drawn from 20 C.F.R. will be cited "Reg. §—" or "Rule—."

**3.** Pearson has applied for supplemental security income benefits three times. Her November 30,

1981 and April 27, 1982 applications (R. 47, 63) were denied (R. 59, 75), and Pearson failed to appeal. Pearson filed her present application July 30, 1984 (R. 78).

**4.** At that time she complained of severe lower back pain.

right knee, left shoulder, right wrist and both elbows. He also found a slight atrophy of Pearson's right calf. Dr. Jean-Jacques attributed those limitations to osteoarthritis, secondary to post-poliomyelitis (R. 155–57). Dr. Edward Doran's August 11, 1984 examination found a full range of motion in all Pearson's joints except the left elbow and right knee. He found no objective basis for Pearson's back pain (R. 161–65). Dr. David Edelberg, who examined Pearson most recently, found only a limited range of motion in her right knee. He did note, however, Pearson had an abnormal exercise tolerance test and x-rays showed deformities in her right knee and foot (R. 259–61).

Secretary's other consulting physicians also differed as to the results of Pearson's EKGs. Dr. Rojan Copal, interpreting Pearson's August 11, 1984 EKG, classified it as "abnormal" (R. 167). Pearson had a similar test on September 13, 1984, which Dr. G. Geel classified as "normal" (R. 171). Still another cardiologist, Dr. Irshad, examined the results of both tests and reported them to be "normal" (R. 177–78). In April 1985 Pearson was given an exercise tolerance test, the results of which Dr. Cohen found "abnormal" (R. 242). Dr. Irshad, however, reported such a test result would not preclude Pearson from doing medium work (R. 258).

Two physicians submitted evaluations of Pearson's ability to do work. Neither actually examined Pearson, and their evaluations are based entirely on the objective medical reports of other doctors.[5] On July 19, 1982 Dr. John Wyness evaluated Pearson's physical impairments and found she could perform light work (R. 159). Dr. Barringer's May 15, 1985 evaluation found even fewer restrictions (R. 263).

At the hearing before ALJ Walsh, Pearson testified her back was her worst impairment. She suffers from constant, aching back pain with occasional sharp pains

(R. 32). Her right leg also causes her constant pain. Pearson claims her pain prevents her from standing for more than 25 minutes (R. 33). She testified her blood pressure causes her to feel dizzy and she suffers from occasional chest pain as well as nervousness (R. 33, 35, 44). According to Pearson's testimony, her back pain and other symptoms prevent her from sitting for long periods, restrict her ability to walk more than one block and make it difficult for her to bend (R. 36). She is still able to clean her apartment and does her own cooking (R. 37–38). She testified specifically the pain in her leg would prevent her from operating the leg press on a sewing machine (R. 43).

### Applying the Statutory Regulatory Framework

To establish entitlement to supplemental security income benefits, a claimant must show he or she is "disabled." Section 1382c(a)(3)(A) defines "disabled" as:

> [i]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months.

Secretary has promulgated extensive procedural regulations for determining whether an applicant is disabled. *Garfield v. Schweiker,* 732 F.2d 605, 607 n. 2 (7th Cir.1984) summarizes Secretary's five-step test for that determination:

> The following steps are addressed in order. (1) Is the claimant presently employed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of the list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next

---

**5.** Three other evaluations of Pearson's physical abilities are also part of the record (R. 58, 74, 89). Those were prepared by Secretary's disability examiners (based on their interviews of Pearson) and then reviewed by doctors. All three examiners concluded Pearson was not disabled. All three evaluations were prepared before Congress amended the Act October 9, 1984, adding the new standard for evaluating pain.

step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination the claimant is not disabled. 20 C.F.R. § 404.1520 (1983).[6]

Once a claimant has demonstrated an impairment of sufficient severity to prevail at step 4, *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir.1984) teaches:

> The burden then shift[s] to the agency to show the claimant retained the residual functional capacity to perform other work in the national economy.[7]

At that fifth and final step Secretary must consider all the claimant's physical and mental impairments (Reg. § 416.961), the claimant's age (Reg. § 416.963), education (Reg. § 416.964) and work experience (Reg. §§ 416.965 and .968).[8] Toward that end the ALJ typically looks to the "Grid," medical-vocational guidelines (found at 20 C.F.R., Subpart P, Appendix 2) that balance the claimant's physical limitations against the other relevant factors (Reg. § 416.969). Before doing so the ALJ must determine what type of work a claimant is capable of performing in light of his or her impairments. Secretary's regulations define types of work using physical exertion criteria (Reg. § 416.967).[9] Alternatively the ALJ may base the step 5 determination on other evidence, including the assessment of a vocational specialist (Reg. § 416.966(e)).

In all events, Secretary's decision must be upheld unless (1) the findings are not supported by substantial evidence or (2) Secretary has applied incorrect legal standards (Sections 405(g) and 1383(c)(3)). *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938), has defined "substantial evidence" as:

> Such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

### ALJ Walsh's Decision

■ Based on the medical evidence and Pearson's testimony, ALJ Walsh found Pearson has been unemployed since 1973 (sic, should be 1972) and suffers from several physical impairments, but did not qualify as disabled under the list of impairments in Reg. Subpart P, Appendix 1 (R. 13). At step 4 of the sequential analysis the ALJ then determined (R. 13):

> (3) The claimant's testimony at the hearing with respect to her pain and functional limitations was not fully credible and was not supported by the objective evidence of record.

> (4) The claimant has a residual functional capacity to perform work-related activities except for work involving heavy or medium exertion (20 C.F.R. 416.945).

> (5) The claimant's past relevant work as a sewing machine operator did not require the performance of the work related activities precluded by the above limitations (20 C.F.R. 416.965).

> (6) The claimant's impairments do not prevent the claimant from performing her past relevant work.

6. [Footnote by this Court] *Johnson v. Heckler*, 769 F.2d 1202, 1209–13 (7th Cir.1985) invalidated step 2 of Secretary's formulation (an issue to be argued before the Supreme Court in another case this Term). ALJ Walsh did not use that step when evaluating Pearson's alleged disability.

7. [Footnote by this Court] Section 1382c(a)(3)(B) defines "work which exists in the national economy" as "work which exists in significant numbers either in the region where [the claimant] lives or in several regions of the country." Secretary must ignore existing economic conditions and actual hiring practices and focus solely on the claimant's physical and mental ability to perform jobs that exist in the national economy.

8. See Section 1382c(a)(3)(B).

9. For example, Table No. 2 is the part of the Grid for claimants capable of performing only "light work." Under that Table, Rule 202.02 directs a finding of "disabled" for a claimant who is capable of light work, is of advanced age, has a limited education and formerly did semi-skilled work, but whose skills are not readily transferable to other work.

To support those findings the ALJ relied almost exclusively on the medical reports of Drs. Doran, Edelberg and Irshad and on parts of Pearson's testimony at the Hearing (R. 10–12).

Though Pearson alleges numerous legal errors by the ALJ, they can be condensed into two major complaints:

    1. ALJ Walsh's conclusion that Pearson is capable of doing her past relevant work is contrary to the substantial weight of the evidence.

    2. In any event the ALJ should never have discussed Pearson's ability to do her past work, as she has impairments that are equivalent to a listed impairment.

According to Pearson, ALJ Walsh's failure properly to assess Pearson's pain contributed to both the ALJ's errors. And if Pearson is correct as to ALJ Walsh's having treated her subjective complaints of pain improperly, she is also correct in saying that had a dual impact. Pain is a symptom ALJ Walsh had to consider when making the step 3 and step 4 determinations, because Pearson's pain was relevant both to whether her impairment met the listed impairments and to her ability to perform her past work.

### Pearson's Complaints of Pain

ALJ Walsh rejected Pearson's testimony regarding her pain because he found her testimony "was not fully credible." He based that finding on a claimed lack of support by the objective evidence in the record (R. 12). His reasoning is ambiguous and, as Pearson points out, may show the application of an improper standard for assessing an applicant's pain. But even if it is assumed ALJ Walsh applied the proper standard, his evaluation of Pearson's pain is not supported by substantial evidence. Accordingly the ALJ did improperly reject Pearson's testimony regarding her pain.

Section 423(d)(5)(A) [10] has recently [11] codified the proper standard for evaluating pain in disability claims:

An individual statement as to pain and other symptoms should not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

That standard essentially codifies Secretary's own regulations for evaluating pain (Reg. § 416.929). As interpreted by *Green v. Schweiker*, 749 F.2d 1066, 1070–71 (3d Cir.1984):

The new statute does not require objective medical proof of each and every element of pain; if such were the requirement, there would be no need for a separate section on evaluation of pain.... [P]ain must be considered, can be disabling in itself, and is often not subject to strict objective medical proof.... [W]hile there must be objective medical evidence of some condition that could

---

**10.** Section 1382c(a)(3)(H) makes the same standard applicable to disability determinations regarding supplemental security income benefits.

**11.** Congress so amended the statute October 9, 1984 by Pub.L. 98–460, applicable "to determinations made prior to January 1, 1987" (Pub.L. 98–460 § 3(a)(3)).

reasonably produce pain, there need not be objective evidence of the pain itself.

■ Under the new statute the ALJ had to make two separate findings when evaluating Pearson's subjective complaints of pain:

1. whether or not Pearson suffered from medically determinable impairments that could reasonably produce her pain and

2. whether or not Pearson's level of pain prevented her from working.

See *Foster v. Heckler,* 780 F.2d 1125, 1130 (4th Cir.1986).

*Hand v. Heckler,* 761 F.2d 1545, 1548–49 (11th Cir.1985) (footnote and citation omitted) directly addressed the first question:

Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce such pain. This determination is a question of fact which, like all factual findings by the Secretary, is subject only to limited review in the courts to insure that the finding is supported by substantial evidence.

On that score ALJ Walsh found (R. 12):

The medical evidence of record in this case shows that the claimant suffers from the following impairments: a history of hypertension, diabetes mellitus; a history of chest pains; and multiple arthralgias.[12] The evidence of record reveals that the claimant's subjective complaints are not supported by the objective evidence of record.

This Court will assume arguendo ALJ Walsh applied the proper standard and found Pearson's medically determinable impairments did not provide a reasonable basis for her pain and dizziness.[13] Even on

that assumption in the ALJ's favor, however, such a finding is not supported by substantial evidence.

ALJ Walsh's evaluation of the evidence simply (1) ignored much of the objective medical evidence favorable to Pearson and (2) misused other evidence. This opinion will deal successively with both types of impropriety.

In the first category, the ALJ did not even mention Dr. Jean-Jacques' report, which found significant restrictions on Pearson's range of motion in several of her joints. Nor did ALJ Walsh discuss the reports by cardiologists who found Pearson's resting EKG and exercise tolerance test to be "abnormal." In like fashion he apparently ignored the radiology reports that found evidence of scoliosis, osteoarthritis secondary to post-polio and possible disc disease. Much of that ignored evidence directly contradicts the medical findings cited by the ALJ.

■ *Zblewski v. Schweiker,* 732 F.2d 75, 78–79 (7th Cir.1984) teaches:

In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is "substantial" only when considered in isolation. It is more than merely "helpful" for the ALJ to articulate reasons (*e.g.,* lack of credibility) for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review.

ALJ Walsh made no such "reasoned rejection" of the entire range of evidence just referred to.[14] Although Secretary's choice generally controls as to contradictory evidence, *Stephens v. Heckler,* 766 F.2d 284, 288 (7th Cir.1985), this Court is unable to

---

**12.** [Footnote by this Court] Webster's Third New International Dictionary defines "arthralgia" as "neuralgic pain in one or more joints."

**13.** *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984) teaches:

[The ALJ] may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. ALJ Walsh's language could reasonably be read as impermissibly rejecting Pearson's complaints

because the record evidence did not "fully" support them. This opinion nevertheless gives the ALJ the benefit of the doubt in that respect.

**14.** ALJ Walsh said only (R. 12):

These reports [prior to 1982] have been evaluated, but will not be specifically summarized in this decision.

That does not qualify as a "reasoned rejection of the evidence."

determine whether the ALJ made such a choice or simply ignored relevant evidence. When an ALJ rejects evidence that supports claimant's position, he must articulate reasons for having done so. *Halvorsen v. Heckler*, 743 F.2d 1221, 1226–27 (7th Cir.1984).

As already stated, ALJ Walsh actually misused some of the other medical evidence.[15] He discounted Pearson's deformed right knee as the basis for her possibly disabling pain because "she worked most of her adult life with this deformity prior to her alleged onset of disability" (R. 12). Pearson's ability to use her leg 15 years earlier (when she was in her middle 40s) is virtually (if not indeed totally) irrelevant. What is relevant is that her leg and knee are clearly deformed and could reasonably cause her severe pain today. See *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir.1984). ALJ Walsh also cited Pearson's medical records from her visits to the Madison Medical Center as showing her complaints of pain "were sporadic in nature and generalized." As Pearson points out, she is poor and had to depend on the neighborhood clinic for her medical treatment. It hardly seems fair to hold those medical records against her when any omissions or contradictions could just as likely be caused by sloppy record-keeping because of the heavy workload at such clinics.

As noted earlier in this opinion, although some of the medical evidence is contradictory, there is overwhelming objective medical evidence that Pearson suffers from high blood pressure, diabetes, osteoarthritis of her spine (secondary to post-poliomyelitis) and a deformed right leg and knee (also caused by her childhood polio).[16] Pearson's high blood pressure and diabetes, although controlled by medication, provide a reasonable basis for her complaints of dizziness (cf. *Green*, 749 F.2d at 1071). Pearson's arthritis and deformed knee are objective impairments that account for her back and leg pain (cf. *Foster*, 780 F.2d at 1130). Thus Pearson unquestionably met her burden of showing the existence of medical impairments that *could* produce those subjective symptoms of pain.[17]

ALJ Walsh next had to determine the effect of Pearson's pain on her ability to work. To make that second inquiry the ALJ had to evaluate Pearson's credibility. Any such ALJ finding is entitled to considerable weight. *Bibbs v. Secretary of Health, Education and Welfare*, 626 F.2d 526, 528 (7th Cir.1980). All the same, this Court need not simply rubberstamp an ALJ's findings as to credibility. As *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir.1986) says:

> The [ALJ] must articulate at some minimal level his analysis of the evidence in cases in which considerable evidence is

15. ALJ Walsh quoted Dr. Edelberg as finding "the claimant's subjective complaints were not well coordinated with the physical findings" (R. 11). Although a statement in that form would appear to support the ALJ's conclusion, he did not quote Dr. Edelberg fully—and hence accurately. Dr. Edelberg found Pearson's complaints were "not well coordinated by findings on the physical examination" (that is, *his own*) (R. 261). Dr. Edelberg is not a radiologist and did not x-ray Pearson's back. Earlier x-rays and reports by radiologists clearly establish Pearson suffers from arthritis and a deformed knee, both of which provide an objective basis for her pain (R. 143, 166). Secretary's regulations make clear the objective medical findings necessary to support subjective complaints of pain can include laboratory findings such as x-rays (Reg. § 416–928(c)). Such findings, available to the ALJ, were not adverted to by Dr. Edelberg.

16. Despite Secretary's arguments to the contrary, Pearson was told by several doctors she suffers from the residual effects of her childhood polio. Those doctors referred to her condition as "post-polio melitis" (R. 133). Pearson uses the term "post-polio syndrome" in her brief to refer to the same condition.

17. Pearson's chest pains are another story. Although the record contains medical evidence that could substantiate those pains, that evidence is contradicted (R. 167, 171, 177). In any event Pearson does not appear to claim her chest pain is disabling (but see R. 79). At the Hearing she testified she has only occasional chest pain (R. 44).

presented to counter the agency's position.

Accord, *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir.1985).

■ ALJ Walsh satisfied that minimal standard of articulation. But merely explaining his analysis is not enough, for that analysis contradicts much of the evidence in the record and is therefore not supported by substantial evidence.[18] ALJ Walsh found Pearson's testimony as to her functional limitations was not supported by the objective evidence of record (R. 13). Although that finding too was ambiguous,[19] it appears from his opinion ALJ Walsh believed Pearson's testimony regarding her daily activities contradicted her testimony as to her ability to work. Were that true, the "contradiction" would be a legitimate basis for rejecting Pearson's testimony. But once more the ALJ's opinion misrepresents Pearson's testimony.

Pearson never testified she was bedridden, unable to walk or unable to care for herself. Those are not prerequisites for being disabled. Pearson did testify she is still able to operate her electric sweeper, make her bed, cook several times a week and occasionally climb stairs. She still attends church and does her own laundry and grocery shopping (R. 37–39). ALJ Walsh apparently believed that testimony contradicted Pearson's claims she can sit or stand for only 20 to 25 minutes at a time because of her pain, can walk only one block and could not operate a sewing machine because of her bad leg and back (R. 33, 36, 43).

After examining the record as a whole, this Court cannot credit the claimed contradictions. Although Pearson does her own grocery shopping and laundry, she does not walk to the store or laundromat and does not carry her own grocery bags (R. 37, 42). She goes to church but is unable to sit through the entire service because of her pain (R. 38–39). Her ability to do some light housework hardly contradicts her claim that she is unable to sit, bent over a sewing machine, for an eight-hour workday. Those "contradictions" are the only legitimate reason given by the ALJ for discrediting Pearson's own evaluation of the effect of her pain on her ability to work.[20] Because that reason is not supported by the record, ALJ Walsh committed plain error when he discredited the evidence.

### Step 3 Determination

Step 3 of Secretary's sequential analysis required the ALJ to determine whether Pearson has a disability that meets or equals an impairment listed in 20 C.F.R. Subpart P, Appendix 1.[21] Pearson's multiple impairments had to be evaluated in combination to see if they equaled a listed impairment. Section 1382(c)(3), (6).

■ Because the regulatory listing does not contain all possible disabling impairments, an ALJ must sometimes determine medical equivalence: whether the medical findings in the record show an impairment that is not listed but is equivalent in severity to the medical findings for the listed impairments. SSR 83–19. ALJ Walsh was obligated to consider the effect of Pearson's pain when determining such equivalence. If the ALJ found Pearson's subjec-

---

**18.** This opinion's deferential yet actual review of the ALJ's credibility determination is wholly consistent with *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir.1986).

**19.** Once again this Court gives ALJ Walsh the benefit of any doubt by assuming he has applied the correct legal standard and has not rejected Pearson's testimony solely because it is not "fully" supported by objective medical evidence.

**20.** ALJ Walsh also cited Pearson's ability to play the piano as contradicting "her" claim that she

cannot use her hands effectively (R. 12). But nowhere does Pearson make such a claim. In fact, it was one of Secretary's own examiners who first opined Pearson had a limited ability to use her hands (R. 58).

**21.** According to Secretary's rulings (SSR 83–19):

The listing contains over 100 examples of medical conditions which ordinarily prevent an individual from engaging in any gainful activity. The listing permits adjudicators to quickly and readily identify those persons who clearly have disabling impairments.

tive complaints inconsistent with the objective medical evidence, he was required to consider the possibility of a mental impairment. *Benson v. Heckler*, 780 F.2d 16, 18 (8th Cir.1985).

This Court, lacking medical expertise, is prepared to accord deference to those medically-based determinations by the ALJ. However, such determinations must still be supported by substantial evidence to be affirmed (see *Collord v. Heckler*, 633 F.Supp. 902, 907–08 (N.D.Ill.1986)).[22] As *Williams v. Bowen*, 85 C 2653, slip op. at 3 (N.D.Ill. May 14, 1986) said:

> In order for the court to provide meaningful review, it is not enough for an ALJ to recite medical terms for a claimant's ailments, and then conclude from that whether he or she is disabled.

Pearson argues ALJ Walsh failed to properly evaluate the equivalence of her combined impairments to those listed in Secretary's regulations. Specifically Pearson claims her condition (post-polio syndrome) equals the musculoskeletal impairments described in Sections 1.04 (impairments affecting the upper extremities) and 1.05 (impairments affecting the spinal column) of 20 C.F.R. Subpart P, Appendix 1.

That contention does not bear scrutiny. Section 1.04 requires arthritis in one major joint of each upper extremity with persistent pain and stiffness, marked limitations in motion of each affected joint and x-ray evidence of bone changes. Section 1.05 requires pain, muscle spasm and limitation of spinal motion. This Court can find no

medical evidence in the record of the kind called for in either Section, and Pearson does not point to any such evidence or its equivalent.

■ In sum, ALJ Walsh made several legal errors when making his step 3 analysis,[23] but substantial evidence still appears to support a finding of no equivalence.[24] Remand to the ALJ for a reconsidered step 3 determination would seem appropriate if this were Pearson's only persuasive assignment of error. Because of this Court's final disposition of Pearson's claim, however, remand is not necessary.

### Step 4 Determination

■ Step 4 of Secretary's sequential process required ALJ Walsh to determine whether Pearson is physically capable of doing her former work (Reg. § 416.920(e)). That evaluation required the ALJ to:

> ascertain the demands of that work in relation to the claimant's present physical capacities.

*Strittmatter*, 729 F.2d at 509. Thus the ALJ should have determined the demands of Pearson's past work and compared them with her present physical limitations (*id.*). That requires an individualized comparison (see *Heckler v. Campbell*, 461 U.S. 458, 467, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66 (1983)). Because ALJ Walsh failed to make such an individualized comparison and improperly discounted the limitations caused by Pearson's pain, his finding that Pearson is still capable of working as a sewing machine operator must be reversed.

---

22. After all, the ALJ is no medical expert either. Indeed, some of the most troublesome disability cases stem from ALJ tendencies to play amateur doctor.

23. Those errors include the following:
   1. ALJ Walsh simply listed Pearson's impairments and then said they did not meet or equal those listed in Secretary's regulations. Such an uninformative evaluation makes meaningful judicial review impossible.
   2. Because the ALJ improperly discounted Pearson's subjective complaints, he did not give them adequate weight when evaluating the severity of her impairments.
   3. ALJ Walsh failed to consider the possibility Pearson suffered from a mental impair-

ment (see *Benson*, 780 F.2d at 18), and Secretary's Appeals Council found no evidence of such an impairment (R. 3). That ignores Pearson's testimony she is taking Librium, a prescription drug for depression and nervousness (R. 35). Such a prescription obviously required a diagnosis by a doctor.

24. One of Secretary's physicians evaluated the medical report most favorable to Pearson (that by Dr. Jean-Jacques) and found no equivalence (R. 73–74). That evaluation alone, where subsequent reports are less favorable to Pearson, is substantial evidence of no equivalence (cf. *Fox v. Heckler*, 776 F.2d 738, 742 (7th Cir.1985)).

ALJ Walsh found Pearson capable of performing light or sedentary work in spite of her impairments (see Reg. § 416.967). He then reasoned that because Pearson's former work as a sewing machine operator was sedentary in nature she must be able to do her former work (R. 13). Even assuming (but only arguendo) the ALJ's findings as to Pearson's ability to do light and sedentary work are correct,[25] his "reasoning" is flawed.[26] "Sedentary work is not homogeneous with respect to strenuousness." *Strittmatter,* 729 F.2d at 509. ALJ Walsh improperly failed to compare the actual requirements of Pearson's former work with her present physical capabilities, including the limitations imposed on Pearson by her pain.

■ What does that required comparison show? Pearson's former work as a sewing machine operator required her to sit at her machine for most of the weekday, with constant bending and the use of a leg press. Pearson also had to carry material to her station and the finished product to other stations, thus lifting 7 to 10 pounds and walking a short distance (R. 109–14). Pearson suffers from arthritis in her back and has a deformed right leg, impairments that cause significant pain when she sits or stands for long periods of time and make it difficult for her to bend. Pearson testified she would be unable to operate the leg press because of her impairments (R. 43).

All this evidence, when given its proper weight, is uncontradicted in the record.[27] Despite Pearson's alleged ability to do generalized light or sedentary work, it must be concluded she is unable to do her past work of operating the sewing machine.[28]

*Step 5 Determination*

Because ALJ Walsh found Pearson could perform her former work, he did not make a step 5 determination (see *Garfield,* 732 F.2d at 607 n. 2). Despite the fact Secretary has the burden of proof on step 5 (*Smith,* 735 F.2d at 270), it is usually appropriate for a court to remand and allow the ALJ to make a step 5 determination. *Aviles v. Heckler,* 618 F.Supp. 1286, 1292 (N.D.Ill.1985). Here however the ALJ properly developed a complete record—one enabling a decision at every step of the analysis. See *Cannon v. Harris,* 651 F.2d 513, 519 (7th Cir.1981) (per curiam). Therefore, as in *McKenzie v. Heckler,* 589 F.Supp. 1152, 1160 (N.D.Ill.1984) (citations omitted):

> [R]emand is inappropriate for [the step 5 evaluation] because had the evaluation by the ALJ continued, application of the medical-vocational guidelines found in 20 C.F.R., pt. 404, subpt. p, app. 2 (1982) would have directed a conclusion of disability based on "grid" Rules [202.02 and 202.00(4)], a decision in which the ALJ has no discretion.

25. Because ALJ Walsh improperly discredited Pearson's subjective complaints, he did not take them into account when determining her residual functional capacity (Reg. § 416.945).

26. In syllogistic terms, the ALJ has displayed the fallacy of the undistributed middle:
   1. Pearson can perform some sedentary work.
   2. Her last job was sedentary.
   3. Therefore [sic] she can perform her last job.
   To mix metaphors, the ALJ has ignored the modified *Animal Farm* principle that "some sedentary jobs are more equal than others."

27. Earlier determinations by Secretary's examiners (R. 159, 263) are based on objective evidence alone and cannot be said to contradict Pearson's testimony.

28. One other point is worth noting in this respect. Ordinarily the time lag between a claimant's last employment and a disability determination is far, far less than the 13 year gap in this case. There could well be a serious question whether Pearson's "former occupation" remains relevant (see Reg. § 416.965(a))—for example, if the machine or job requirements had substantially changed since 1972 the appropriate question would be one of the *transferability* of Pearson's skills (even assuming she had retained them over time). Later text discussion reflects the Grid determination that skills are *not* transferable for someone of Pearson's age. Because it makes no difference in the ultimate outcome, this opinion assumes the difficulties identified in this footnote are non-problems.

Rule 202.02 applies to individuals capable of performing light work.[29] That rule directs a finding of disabled for individuals of advanced age, with a limited education, who formerly did skilled or semi-skilled work, but whose skills are not readily transferable to other work. According to Secretary's regulations and the administrative record, Pearson is of advanced age (over 55) (Reg. § 416.963(d)), has a limited education (7th–11th grade) (Reg. § 416.-964(3)) and formerly did semi-skilled work (Reg. § 416.968(b)). Because of Pearson's age (60 at the time of the ALJ's decision) Pearson's skills are nontransferable (Reg. §§ 416.963(d), .968(d) and Rule 202.00(f)). Rule 202.02 therefore mandates a finding Pearson was disabled when ALJ Walsh issued his recommended decision.

### Conclusion

There is no dispute as to any material fact, and Pearson is entitled to a judgment as a matter of law. Secretary's decision Pearson is not disabled is not supported by substantial evidence and is reversed, with directions to pay Pearson the claimed benefits.

### SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

■ This Court's November 6, 1986 memorandum opinion and order (the "Opinion") resolved the cross-motions for summary judgment filed by claimant Judy Pearson ("Pearson") and Secretary of Health and Human Services Otis Bowen ("Secretary"). Because there were no disputes as to any material fact, Pearson was found entitled to a judgment as a matter of law:

(1) determining Secretary's decision that Pearson is not disabled was unsupported by substantial evidence and

(2) reversing Secretary's decision with directions to pay Pearson the claimed supplemental security income benefits.

Secretary has filed a timely motion under Fed.R.Civ.P. ("Rule") 59(e) to alter or amend the judgment in Pearson's favor "by remanding this case to [Secretary] to continue the sequential evaluation at Step 4, 20 C.F.R. § 416.920(e) (1986)." Secretary has filed a supporting memorandum, and Pearson's counsel has responded with a memorandum opposing Secretary's motion. For the reasons briefly stated in this supplement to the Opinion, Secretary's motion is granted in part and denied in part.

There is no basis for any remand for a step 4 determination. In this instance the ALJ made a complete record on Pearson's ability (or more accurately lack of ability) to perform her last relevant work, but then reached a decision totally at odds with the evidence. Only one decision could reasonably have been reached on that score: Pearson could *not* perform such work. Under the circumstances, nothing entitles Secretary to a second bite at that apple.

But on the question whether this Court must remand to allow Secretary to make a determination at step *5,* language in our Court of Appeals' opinion in *Johnson v. Heckler,* 741 F.2d 948, 952–53 (7th Cir. 1984) appears to require that result rather than the outright reversal ordered in the Opinion. Though the context in which the issue arose in *Johnson* was different, its literal language would require remand and not reversal (*id.* at 952):

> Once the magistrate concluded that substantial evidence did not support the Secretary's finding that Johnson could return to her past relevant work his scope of review terminated. By proceeding further and determining that Johnson had transferable skills, a determination which the Secretary has found difficult to make, the magistrate usurped a function of the Secretary which was critical to the outcome of Johnson's claim.

If a judicial officer usurps Secretary's function by determining a claimant *has* transferable skills, presumably a like usur-

---

**29.** Once again this Court will assume the correctness of the ALJ's finding Pearson could perform light and sedentary work (R. 13).

pation is involved in determining a claimant *does not.* True enough, in this circumstance it appears extraordinarily remote that a finding of transferable skills could be made or, if made, could be upheld on further review. Nonetheless judicial responsibility compels adherence to *Johnson* (a case not referred to in Secretary's memorandum on the original motion for summary judgment).

Two comments are in order in connection with the remand:

1. Secretary's current memorandum is wrong in stating testimony of a vocational expert is necessary in determining transferability of skills. Nothing in Secretary's own regulations requires that, though Secretary is of course free to make use of such testimony on remand.

2. In light of the extremely narrow scope of inquiry open on remand, a short timetable should suffice to complete the rehearing.

At this morning's status hearing, during which this Court announced its decision to the effect stated in this supplement, counsel for Secretary advised a 91–day period should be adequate to complete the proceedings on remand, notwithstanding the existing administrative caseload burden.

Accordingly the judgment order entered pursuant to the Opinion is amended by requiring a remand to Secretary rather than outright reversal and payment of benefits. That remand is for the limited purpose of determining whether Pearson is unable to perform other work in the national economy (a step 5 determination), with the final decision on that issue to be reached by Secretary on or before March 2, 1987.